■ In the Matter of JOSEPH SMITH et al., Respondents, v CITY UNIVERSITY OF NEW YORK et al., Appellants. [661 NYS2d 599] —Order and judgment (one paper), Supreme Court, New York County (Karla Moskowitz, J.), entered February 26, 1996, which, *inter alia*, adjudged that respondents violated the Open Meetings Law by conducting a closed meeting on March 30, 1994 and that petitioners are entitled to costs and attorneys' fees, and which annulled all actions taken at said meeting concerning a certain student newspaper, unanimously reversed, on the law, without costs, respondents' actions reinstated and the petition dismissed. Order, same court and Justice, entered October 23, 1996, which awarded petitioners $35,839.86 in attorneys' fees, unanimously reversed, on the law, without costs, and the order vacated.

Petitioners brought this CPLR article 78 proceeding alleging that they were barred from a meeting of respondent Fiorello H. LaGuardia Community College Association, Inc., held on March 30, 1994. In this proceeding, commenced by filing a petition and notice of petition dated August 3, 1994, petitioners contend that their exclusion was in violation of Public Officers Law article 7, popularly known as the Open Meetings Law.

As a threshold matter, this proceeding was timely commenced. The Public Officers Law provides for enforcement by way of a proceeding pursuant to CPLR article 78 for a declara-

tion that actions taken in violation of the statute are void and for reasonable attorney fees (Public Officers Law § 107 [1], [2]). "The statute of limitations in an article seventy-eight proceeding with respect to an action taken at executive session shall commence to run from the date the minutes of such executive session have been made available to the public" (Public Officers Law § 107 [3]). The record reflects that the minutes were mailed to petitioner Smith under an April 5, 1994 covering memorandum, and commencement of this proceeding on August 3, 1994 was therefore within the statutory four-month period (CPLR 217).

Petitioner Joseph Smith, a student at LaGuardia Community College, was editor-in-chief of the student newspaper, The Bridge, at all times relevant to this proceeding. The petition alleges that he paid a student activity fee of $50 for each semester. Petitioner Errol Maitland is a broadcast journalist, who produces news and public affairs programs. The September 1993 issue of The Bridge carried an article containing some highly offensive remarks, vehemently condemning Jews for what the author perceived as their opposition to then Mayor David Dinkins. "Instead of 'bitching,' moaning, crying, and blaming the Black man in office for their problems they should stop to take responsibility for their own actions and take care of their own problems and thank God they didn't die in Hitler's Death Camps." In accusing Jews of ingratitude towards "the Black man", the article stated, "Ask yourself this question, before Jesus Christ was crucified he was wiped [sic], tortured, scolded, cut, punched, kicked, spat upon, stripped, humiliated, degraded, and just down right treated like an animal after he helped those same people, those people were Jewish. Coincidence, I think not." The article provoked a strong reaction on campus, prompting the college president to announce measures to prevent the recurrence of such divisive journalism.

On December 8, 1993, a meeting of the Fiorello H. LaGuardia Community College Association, Inc. (the Association) was held, the minutes of which disclose "a request for an investigation by the College Senate". The Association therefore formed a subcommittee to "review the process and determine if any improprieties were committed, e.g., any violation of the bylaw governing the student publication". The subcommittee was to conduct its hearings with "the highest degree of confidentiality" and to report recommendations or "actions to be taken to prevent a recurrence." A motion to suspend publication of The Bridge pending completion of the investigation was carried by acclamation.

The dean of student affairs subsequently notified petitioners' attorney of the date on which the subcommittee would report to the Association. Suspension of publication was accomplished by her refusal to approve a purchase order for printing the next issue of The Bridge. Publication resumed in the late spring of 1994.

Petitioners were excluded from the Association meeting held on March 30, 1994. At this meeting, the subcommittee submitted its scheduled report, and the Association passed a motion revising the rules governing the newspaper. Funds for certain student activities were also allocated at this time. In support of their application to annul actions taken by the Association at the meeting, petitioners rely on the Open Meetings Law, which mandates access to all meetings at which public monies are allocated (Public Officers Law § 105 [1]).

In order to subject the Association to the requirements of the Open Meetings Law, the Association must be deemed a public body. Public Officers Law § 102 (2) provides that a "public body" is "any entity, for which a quorum is required in order to conduct public business and which consists of two or more members, performing a governmental function for the state or for an agency or department thereof". An organization or entity lacking the ability to exercise the power of the sovereign does not perform a governmental function, and hence is not a "public body" subject to the Open Meetings Law (see, Matter of American Socy. for Prevention of Cruelty to Animals v Board of Trustees, 165 AD2d 561, 565, affd 79 NY2d 927; Matter of Poughkeepsie Newspaper Div. v Mayor's Intergovernmental Task Force, 145 AD2d 65, 69; New York Pub. Interest Research Group v Governor's Advisory Commn., 133 Misc 2d 613, 617, affd without opn 135 AD2d 1149, lv denied 71 NY2d 964). An entity not empowered to make law or enact regulations or directly impact State law or policy does not exercise the power of the sovereign (supra).

Petitioners sought access to the March 30, 1994 meeting conducted by the Association because, on that occasion, it allocated funds collected from the students in the form of mandatory student activity fees. However, the Association is incorporated as a distinct entity, separate from the university, and the student activity fees are maintained in a segregated account in the name of the Association. The student activity fund is distinguishable from State or Federal monies in that the student activities fees are collected by, and remain the property of, the students. Any money that is not allocated by the Association remains in the separate account and never becomes part of the

university's general revenues. By contrast, monies maintained in all other college accounts comprise part of the university's budget and, as such, are required to be turned over to the State if not used.

The "City University Fiscal Handbook for the Control and Accountability of Student Activities Fees" contains detailed procedures for the collection and application of funds, including public hearings regarding funding requests. With respect to the application of student activities funds, the Association's role is limited to the review of recommendations made by the student government and by the Association's budget committee. In performing its function, the Association's power is restricted to the approval or disapproval of proposed expenditures. As stated in the "City University Fiscal Handbook", under the bylaws of the Board of Trustees of the City University of New York, the Association is without authority to impose or adopt new or different expenditures, and it has authority to deny only allocations that either fail to conform to expenditure categories enumerated in the bylaws or that are otherwise "inappropriate, improper or inequitable." Furthermore, the budget determinations made by the Association remain subject to final review by the college president. Thus, it is the president, not the Association, who has the final decision-making power with respect to allocation and expenditures.

The Association's primary purpose is not to serve the State, but the student body. Moreover, the Association does not possess final decision-making authority but performs an advisory role with respect to expenditures. It does not exercise the power of the sovereign because the funds it oversees, being segregated from the university's general revenues, do not constitute State funds. Thus, the Association does not directly impact the functioning of the government of the State, it does not perform a governmental function and it cannot be considered a public body. We therefore conclude that it is not governed by the Open Meetings Law and that the meeting conducted by the Association on March 30, 1994 was properly closed.

Petitioners nevertheless contend, incongruously, that the Association must be deemed to be a public body precisely because it "allocates public funds and regulates free speech in a public forum." However, it would seem that before First Amendment principles are implicated, it must be demonstrated that the Association is a public body. Petitioners charge that "the deliberate closure of the College Association meeting on March 30, 1994 was part of a long-standing pattern of harassment by appellants which abridged the First Amendment rights of The

Bridge's editors and punished them from exercising those rights in the past."

It should be noted that the vote to suspend publication was taken at the meeting of the Association conducted on December 8, 1993 and that the petition concerns the meeting held on March 30, 1994. The propriety of the actions taken at the earlier meeting is therefore not before us (Public Officers Law § 107 [1]).

Petitioners argue that the United States Supreme Court's rationale in *Rosenberger v Rector & Visitors of Univ. of Va.* (515 US 819) is dispositive of the question of whether the Association exercises a governmental function. However, *Rosenberger* deals with the refusal of a university to provide *any* funding for a student publication with a religious viewpoint. Clearly, in the instant matter, the Association has provided and continues to provide funding for The Bridge. The constitutional concern raised by the suspension of funding in this case is therefore distinguishable, involving the extent to which an academic institution may regulate the publication as a means of deterring offensive and divisive expression targeted at a particular religious or ethnic group.

Having confined the basis of their petition to the asserted violation of the Open Meetings Law, this Court's review is limited to consideration of whether the Association's allocation of funds for student activities, as one step in a detailed budget process, renders it a public body. We conclude that it does not. Concur—Rosenberger, J. P., Wallach, Rubin, Williams and Andrias, JJ.